UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-mj-02526-Louis

IN RE SEALED COMPLAINT

_____/

FILED BY ____CB____ D.C.

Mar 15, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:   /s/Felipe Plechac-Diaz
Felipe Plechac-Diaz
Assistant United States Attorney
Florida Bar No. 0105483
500 East Broward Boulevard, Suite 700
Ft. Lauderdale, FL 33394
Tel. (954) 660-5779
Email:   felipe.plechac-diaz@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>TOMAS NIEMBRO CONCHA and<br>JUAN FRANCISCO RAMIREZ,<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 1:25-mj-02526-Louis<br>)<br>)<br>) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 2017 to October 2023__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Instruments |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Derek Newsome, Special Agent IRS-CI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Face Time__

Date: __March 15 2025__

_____
*Judge's signature*

City and state: __Miami, Florida__    Honorable Lauren F. Louis, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Derek Newsome, am a Special Agent with the Internal Revenue Service, Criminal Investigation since 2009. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other items of evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### The Defendants, Relevant Entities, and Overview of the Scheme

1.  At all times relevant to this Complaint:

    a.  Nodus International Bank ("Nodus" or the "Bank") is an international banking entity located in San Juan, Puerto Rico and licensed under Puerto Rican law. Nodus is regulated by the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCIF"). Nodus is not supervised by a federal banking regulator, and its deposits are not insured by the Federal Deposit Insurance Corporation. Defendants Tomas Niembro Concha ("Niembro") and Juan Francisco Ramirez ("Ramirez") have jointly owned Nodus since May 2017. In October 2023, OCIF placed Nodus in receivership and revoked its license. Nodus owes depositors approximately $92 million. Most of the Bank's depositors are located in South Florida and Latin America.

    b.  Defendant Niembro owned 63.31% of Nodus's common shares and served as its President and Chief Executive Officer and was a member of the Bank's board of directors. Niembro resides in Madrid, Spain and spends part of the year in Miami, FL.

    c.  Defendant Ramirez owned 36.69% of Nodus's common shares and served as the Bank's Chairman of the Board of Directors. Ramirez resides in Miami, FL.

    d.  Our Microlending, LLC ("Our Microlending") is a Miami-based microfinance company incorporated in 2007. Our Microlending issues micro loans to small businesses and entrepreneurs in South Florida.

    e.  Emilio Santandreu ("Santandreu") is the owner and Chief Executive Officer of Our Microlending. Santandreu resides in Miami, FL.

    f.  Omar Alireza ("Alireza") is the Chief Financial Officer of Our Microlending. Alireza resides in Miami, FL.

    g.  Niembro and Ramirez, as well as their co-conspirators— including Our Microlending, and its owner, Santandreu—conspired to defraud Nodus and laundered millions of dollars through a series of complex transactions that primarily occurred in Miami, FL. Specifically, between August 2017 and April 2022, Niembro and Ramirez caused Nodus to send more than $11 million of the Bank's funds to Our Microlending in exchange for "certificates of investment," by concealing material information from the Bank's two other board members, whose approval was

1

required to make those investments by the Bank's Investment Policy. Santandreu then caused Our Microlending to loan most of the Bank's funds to Niembro and Ramirez, who then used the funds for their own personal benefit (with respect to the 2017 Transaction and the 2018 Transaction, described below) or laundered funds through various entities to conceal the source and origin of the funds (with respect to the 2022 Transaction, detailed below). Niembro and Ramirez caused the Comptroller at Nodus to record the certificates of investment as assets of Nodus, but in reality the investment certificates were a sham to conceal fraudulent personal loans to Niembro and Ramirez.

## The 2017 Transaction

2.  In August 2017, Santandreu and Ramirez agreed to the following transaction: (i) Nodus would place $2.5 million in Our Microlending for six months and Our Microlending would issue a certificate of investment with an interest rate of 6.13%; (ii) Our Microlending would then lend Ramirez $2,050,000 for six months with an interest rate of 9.63%. Ramirez instructed Santandreu to disburse the $2,050,000 to an account maintained at a Swiss bank by Silton Enterprises S.A., a company registered in Panama. On August 16, 2017, Our Microlending received the funds from Nodus's Puerto Rico-based account by wire transfer to its account at a Florida-based bank and disbursed the loan to Silton Enterprises by wire transfer to an account in Switzerland. Santandreu used the remaining $450,000 to fund loans to other borrowers of Our Microlending. The loan to Ramirez was collateralized by the certificate of investment issued by Our Microlending to Nodus via a private "pledge"—in other words, Ramirez unilaterally signed a document purporting to bind the Bank to guarantee the loan from Our Microlending to Ramirez, even though the pledge stated that the signer had secured all required approvals to sign it.

3.  Pursuant to the Bank's Investment Policy, which was approved by the Board (the four members of the Board are Niembro, Ramirez, Jose Suarez, and Fernando Lacalle and the Board's secretary is the Bank's Comptroller), all certificates of investment purchased by Nodus from Our Microlending required approval from the Board, as such investments constituted an exception to the Investment Policy given that they were investments in a non-banking institution. The Investment Policy additionally set forth that "[t]he general objectives of Nodus's investment portfolio management shall be to provide liquidity, generate a reasonable rate of return, minimize interest rate/market risk, and minimize credit/default risk."

4.  While the Board approved the $2.5 million investment in Our Microlending, neither Niembro nor Ramirez informed the other Board members that the investment was in fact intended to fund a personal loan to Ramirez, or that Ramirez had pledged the Bank's certificate of investment as collateral for his personal loan.

5.  The Bank's extension of a loan to Ramirez—which is what the sham investment truly was—violated the Bank's legal obligations and policies. First, the Puerto Rican statute under which the Bank was organized, the International Banking Center Regulatory Act, provides in part that international banking entities shall not "grant any kind of financing or credit to any of its directors, officers, employees or stockholders, except when previously authorized in writing by the Commissioner [of OCIF]." Nodus did not obtain such authorization, and thus could not legally extend a loan to Ramirez. Nodus's Comptroller indicated that the restriction on insider loans is a well understood principle in the banking industry. Second, the Bank's Investment Policy provides that, "[i]n addressing investment portfolio risks, the Board and Management must be aware of the

2

potential situations that may arise related to diverse types of risks pertaining to the investment portfolio, ranging from investment quality to safekeeping controls." Knowing that the investment in question was in fact a personal loan to Ramirez, and that the certificate of investment had been pledged as collateral for the personal loan, was material to assessing the Bank's investment portfolio risk.

6. Board member Jose Suarez confirmed that when he voted to approve the 2017 investment certificate, he did not know that its purpose was to fund a personal loan to Ramirez. He said he would not have voted to approve the Bank's purchase of the investment certificate if he had known of the back-to-back scheme.

7. On or about February 9, 2018, Santandreu informed Ramirez that his loan for $2,050,000 would not be renewed and that if he did not receive the funds by February 16, 2018, he would use the funds owed by Our Microlending to Nodus in connection with the $2.5 million investment certificate to satisfy Ramirez's loan obligation with Our Microlending, consistent with the pledge that Ramirez had signed. That same day, Ramirez replied as follows: "no entiendo la posicion y menos cuando una cosa no tiene que ver con la otra, donde sabes que es algo completamente ilegal" (unofficially translated as "I don't understand your position, especially when one thing has nothing to do with the other, where you know that it's something completely illegal.") Santandreu understood Ramirez's email to be an acknowledgment by Ramirez that their scheme was illegal. To avoid "making the scheme public," Santandreu did not go forward with using the certificate of investment to pay off Ramirez's loan and instead agreed with Ramirez to renew the certificate of investment and the associated loan to Ramirez multiple times.

### The 2018 Transaction

8. On or about November 26, 2018, Santandreu told Niembro and Ramirez that, as they had discussed recently, in order for Our Microlending to lend Niembro $1.4 million, Our Microlending would have to receive $1.7 million from Nodus in the form of a certificate of investment. Santandreu proposed a six-month term for both the investment certificate and the parallel loan with interest rates of 7.49% and 9.99%, respectively, as well as a 1% commission payable to Our Microlending.

9. Niembro responded that a $1.7 million investment certificate was excessive, and Santandreu replied that Our Microlending was not a bank and that it can only issue a limited number of certificates of investment. Santandreu told Niembro that the excess amount was to compensate for Our Microlending's use of its certificates of investment for this purpose, and that the same approach was applied with respect to Ramirez's loan for $2,050,000. The parties ultimately agreed to the terms offered by Santandreu.

10. The loan to Niembro was similarly collateralized by the associated certificate of investment via a private "pledge," which was signed by Ramirez. The pledge stated that the signer is fully empowered to enter into the Pledge and Security Agreement and that all required approvals had been obtained by it to sign and execute this agreement. But the full Board was never apprised of this collateral and had not approved the pledge.

11. The four members of the Board approved the $1.7 million investment certificate by unanimous resolution dated November 27, 2018, noting both its terms (a $1.7 million "CD" for six months at 7.49%) and that the Bank's Investment Policy required the approval of a special exception for this product because the institution issuing the "CD" was not a bank or credit-rated institution as set forth for pre-approved eligible investments according to the policy. The Board resolution did not mention the personal loan to Niembro nor that the investment certificate collateralized his loan. Further, neither Niembro nor Ramirez informed the Board that the investment was in fact intended to fund a personal loan to Niembro. On or about November 28, 2018, Our Microlending's Miami-based bank account received the funds by wire transfer from Nodus's Puerto-Rico-based account and disbursed the loan proceeds to Niembro. Santandreu used the remaining $300,000 to fund loans to other borrowers of Our Microlending.

12. Board member Jose Suarez confirmed that when he voted to approve the 2018 investment certificate, he did not know that its purpose was to fund a personal loan to Niembro. He said he would not have voted to approve the Bank's purchase of the investment certificate if he had known of the back-to-back scheme.

13. Since Niembro was late in paying off his $1.4 million loan, Our Microlending did not pay Nodus's $1.7 million certificate of investment when it became due in May 2019. On or about May 29, 2019, Nodus's Comptroller asked Our Microlending why Nodus had not received the payoff for the $1.7 million investment certificate. Alireza responded (with Niembro and Ramirez copied), "Nosotros estamos listos para transferir los fondos, pero todavia no hemos recibido el pay-off del loan que esta soportado con ese Certificado de Inversion. Tan pronto ese dinero este en nuestra cuenta, nosotros procederemos con la devolucion de los fondos" (unofficially translated as: "We are ready to transfer the funds, but we have not yet received the pay-off for the loan supported by that Certificate of Investment. As soon as that money is in our account, we will proceed with the return of the funds.")

14. This message from Alireza provoked a concerned response from Niembro, who sent the following reply only to Santandreu and Ramirez, dropping Alireza and Nodus's Comptroller from the email: "Emilio, recuerda que la gente de Nodus no esta enterada de los detalle, para ellos no existe una transferencia que debe entrarte para poder pagar la colocacion. Este tema lo hemos manejado Juan tu y yo" (unofficially translated as: "Emilio, remember that the people at Nodus are not aware of the details, for them there is no transfer that must come in to pay for the placement. This issue has been handled by Juan, you and I.") Santandreu responded by cautioning that he might need to reveal more information to Nodus's Comptroller: "Espero que manana este todo arreglado y asi no habra que decirle nada adicional a Velez. De lo contrario, hagan Uds algo para que el no se inquiete" (unofficially translated as: "I hope that tomorrow everything will be fixed and that way we will not have to say anything additional to Velez [the Comptroller]. Otherwise, you guys do something so he doesn't get worried.") This message from Niembro further corroborates that the other Board members (Suarez and Lacalle) and the Comptroller were unaware of the scheme with Our Microlending.

### The 2022 Transaction

15. On or about January 18, 2022, OCIF began a regulatory examination of Nodus. The examination rated the Bank's capital as a "5" — "the lowest quality and highest level of

4

supervisory concern." Regulators also assessed the Bank's asset quality to be "critically deficient" and pointed specifically to $4 million in promissory notes purchased by Nodus related to loans originated by Intercorp MS. Nodus bought those loans without any credit underwriting during its decision-making process, and Nodus had no financial information for examiners to evaluate Intercorp's financial condition.

16. On February 23, 2022, the Bank's Comptroller messaged Niembro to stress that capitalizing the Bank was the number one priority and warned him that if the capital levels were not improved on or before March 31, 2022, the Bank would have to formally inform OCIF about this matter, which could result in the Bank not being able to issue additional loans or make investments until the situation was stabilized.

17. On March 18, 2022, Niembro messaged Santandreu to arrange a call to discuss a couple of transactions through Our Microlending like the ones they had done in the past. Niembro stated the following: "necesitabamos hacer una operacion por $4.1 pero si pudiera por $6.2 nos da la posibilidad de resolver varias cosas en el Banco" (unofficially translated as "we need to do a transaction for $4.1, but if we could do it for $6.2, it would give us the opportunity to resolve several things at the bank.") Later that afternoon, Niembro asked Santandreu to send the terms of the deal to him and Ramirez to their personal emails. However, Santandreu mistakenly sent the proposed terms to the shareholders' bank email addresses. The transaction was outlined as follows: Niembro and Ramirez were to cause Nodus to place $7 million in Our Microlending in the form of investment certificates at an interest rate of 5.05% for 12 months, and Our Microlending would lend a total of $6.2 million to Niembro and Ramirez at an interest rate of 7.3% for 12 months.

18. On March 28, 2022, Santandreu contacted the Bank's Comptroller and told him that Our Microlending was looking for $7 million in the form of two certificates of investment and offered to pay 4.5% interest rate even though he had already agreed with Niembro and Ramirez to pay 5.05%. On March 31, 2022, the Comptroller replied saying that he spoke to Niembro and Ramirez, and that while both of them were interested in the investment, they would like the interest rate to be improved, further concealing the true nature of the scheme from the Comptroller by pretending to negotiate with Santandreu. Santandreu ultimately offered an interest rate of 5.05%.

19. On March 29, 2022, the Bank's Comptroller submitted a Capitalization Plan to OCIF, which was approved by Niembro and Ramirez. Specifically, the plan represented to OCIF that the Bank's shareholders (Niembro and Ramirez) would inject $2,000,000 of capital to the Bank through the purchase of common shares before April 30, 2022, and an additional $2,000,000 before June 30, 2022.

20. On March 31, 2022, the Bank's Comptroller raised concerns with Niembro and Ramirez regarding the contemplated $7 million investment in Our Microlending, particularly related to how the Bank's liquidity would be affected in the short term. However, Niembro and Ramirez disregarded the Comptroller's concerns.

21. Between April 12 and 13, 2022, the transaction was consummated. Niembro and Ramirez caused Nodus to send $7 million over interstate wires from its Puerto Rico-based account to Our Microlending's Miami-based account as part of two certificates of investment (one for $4 million and the other for $3 million). Santandreu in turn caused Our Microlending to loan $6.4

million to Niembro and Ramirez at an interest rate of 7.3%. Specifically, Our Microlending issued a $3,685,760 loan to Oceana Key Biscayne Corp., a shell company owned by Niembro and his wife; and a second loan directly to Ramirez and his wife for $2,714,240. In total, Our Microlending collected $64,000 in commissions and $467,200 in upfront interest, leaving the net disbursements at $3,379,841.92 to Niembro via Oceana Key Biscayne Corp. and $2,488,958.08 to Ramirez. The loans to Ramirez and Niembro were collateralized by the certificates of investment issued by Our Microlending to Nodus via private "pledges," as with the prior transactions. As in the 2017 and 2018 transactions, the pledges signed by Niembro and Ramirez stated that each signer was fully empowered to enter into the Pledge and Security Agreement and that all required approvals have been obtained by it to sign and execute this agreement. But the board was never apprised of this collateral and had not approved the pledges.

22. The four members of the Board approved the two investment certificates by unanimous resolution dated April 11, 2022, noting its terms (two "CDs" for a total of $7 million at 5.05% with a maturity date of one year). But neither Niembro nor Ramirez informed the other Board members that the $7 million investment was actually intended to finance personal loans to Niembro and Ramirez, and the Board resolution did not mention the personal loans nor that the investment certificates served as collateral for the loans. The Bank's Investment Policy required the Board to be aware of potential risks associated with an investment, including investment quality.

23. Board member Jose Suarez confirmed that when he voted to approve the 2022 investment certificates, he did not know that their purpose was to fund personal loans to Niembro and Ramirez. He said he would not have voted to approve the Bank's purchase of the investment certificates if he had known of the back-to-back scheme.

24. Niembro and Ramirez subsequently laundered the loan proceeds that they fraudulently obtained from Nodus by concealing the true source of the funds from the Bank in various subsequent transactions with Nodus involving those same funds. First, Niembro and Ramirez used the proceeds to make "capital contributions" to Nodus to comply with the Capitalization Plan that they caused the Bank to submit to OCIF. On April 21, 2022, Niembro made a capital injection of $1 million using the fraud proceeds, and on April 22, 2022, Ramirez similarly made a capital infusion of $890,000 to Nodus. By not truly capitalizing the Bank and tying up the Bank's liquidity in the investment certificates with Our Microlending, Niembro and Ramirez harmed the Bank's financial condition.

25. On April 21, 2022, Niembro informed the Bank's Comptroller that $1 million would be arriving at his Nodus account and instructed the Comptroller to take the funds as his capital injection. Specifically, Niembro stated the following: "para que lo tome como mi primer aporte" (unofficially translated as "so that you take it as my first contribution.") The Comptroller understood that these funds were part of Niembro's own personal assets and would have been concerned about Niembro's ability to maintain the Bank well capitalized if he had to borrow funds to make capital contributions.

26. During a Board meeting held on April 29, 2022, which was attended by the full Board as well as the Bank's Comptroller and the BSA Officer, Mr. Niembro reported to the Board that he completed a capitalization of the Bank through the purchase of common shares in the

amount of $1 million and Mr. Ramirez purchased common shares in the amount of $900,000. Again, neither Niembro nor Ramirez informed the Board or the executives in attendance that their capital contributions were proceeds of loans they obtained from the Bank. In effect, Niembro's and Ramirez's fraudulent scheme caused the Comptroller to record loans to the shareholders as investments and capital injections in the Bank's books.

27. Further, Ramirez and Niembro transferred approximately $1.5 million and $2.76 million, respectively, to Intercorp MS, a Miami-based mortgage company, within a few days of receiving the loan proceeds from the scheme with Our Microlending. And just a few days later, out of the $4.26 million that Intercorp MS received from the Bank's owners, Intercorp MS sent approximately $3.86 million to Nodus in five separate payments to satisfy Intercorp MS's outstanding promissory notes with the Bank. On April 21, 2022, before Nodus received any funds from Intercorp MS, Ramirez messaged the Comptroller to ask him whether funds had arrived from Intercorp, demonstrating a scheme orchestrated by the owners to eliminate from the Bank's books Intercorp MS's promissory notes using the Bank's own funds. This scheme made the Bank appear more financially sound to OCIF, which had recently criticized the Intercorp MS promissory notes.

28. Because the Bank had invested more than 25% of its net capital in purchasing the certificates of investment for $7 million from Our Microlending, it was required to notify OCIF of its investments. On May 9, 2022, the Bank's Comptroller sent a letter to OCIF notifying the regulator about its $7 million investment. However, OCIF was not made aware that those investments were in reality loans to the Bank's shareholders.

29. On December 21, 2022, the Bank's Comptroller raised the alarm in an email to the Board (including Niembro and Ramirez) regarding the Bank's dire liquidity levels: "…el Banco NO cumple con los niveles de liquidez acordados por política se debe de trabajar por parte de la Junta un plan de contingencia para solventar el tema a la mayor brevedad posible…Debido a que no tenemos la disponibilidad de inversiones para vender o tomar prestado sobre las mismas se debe de comenzar un proceso de venta de activos (créditos/notas/CD's) y adelantar la capitalización del Banco por parte de los accionistas" (unofficially translated as: "the Bank does NOT comply with the liquidity levels set forth in the policy, the Board must work on a contingency plan to resolve the issues as soon as possible. . . Since we do not have the availability of investments to sell or borrow against, a process of selling assets (credits/notes/CDs) must be started and the capitalization of the Bank must be brought forward by the shareholders.")

30. Notwithstanding these concerns, and OCIF's notification to the owners that they had to liquidate the Bank in early March 2023, Niembro and Ramirez caused the Board in April 2023 to renew the $3 million investment certificate and a $1.575 million certificate (Niembro had repaid approximately $2.4 million of its loan with Our Microlending so the full value of the $4 million investment certificate did not have to be renewed).

31. To date, Niembro and Ramirez have partially repaid the loans that they received from Our Microlending. However, $2,338,909.10 remains outstanding for Ramirez's loan and $341,090.90 remains outstanding for Niembro's loan. As a consequence, Nodus has not been fully repaid by Our Microlending for the investment certificates, to the detriment of Nodus and its depositor

FURTHER AFFIANT SAYETH NAUGHT.

_____
DEREK NEWSOME
SPECIAL AGENT
INTERNAL REVENUE SERVICE

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this __15__ day of March 2025.

_____
HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

8